**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Jagan Bruce,<br><br>　　　　Defendant. | CR 12-02519-TUC-DCB(JR)<br><br>**REPORT AND RECOMMENDATION** |

　　　　This matter was referred to Magistrate Judge Rateau for pretrial matters. On July 23, 2013, Defendant Jagan Bruce filed a Motion to Suppress. (Doc. 133).[1] The government filed a Response on July 30, 2013, and Defendant filed a Reply on August 9, 2013. (Docs. 136, 145). The matter was heard by the Court on September 3, 2013. Defendant was present and represented by counsel. The government

---

[1] Defendant Tamelia Bruce's Motion to Join was withdrawn. (Docs. 142, 157).

1

presented four witnesses.  Five exhibits were admitted at the hearing. (Doc. 157).[2] Having considered the matter, the Magistrate Judge recommends that Defendant's motion be denied.[3]

**I.  Findings of Fact**

    **A.  Special Agent Pedrego**

Agent Pedrego, a special agent with the Department of Homeland Security Investigation ("DHSI"), testified that the investigation in this case began in November of 2011, when agents received information from a confidential source that Jagan and Tamelia Bruce, ("Defendants" when referred to collectively) were coordinating the shipment of marijuana through the mail to various cities on the east coast. (TR 8, 9, 10, 13, 27).  Agent Pedrego became involved in the investigation in October 2012, when he learned that Jagan Bruce would allegedly wrap and package marijuana and wait in the car while his sister Tamelia Bruce went inside postal offices (FedEx and UPS) to mail the packages of marijuana.  (TR 10, 13, 25 34). Agents intercepted some of the packages with the assistance of the U.S. Postal Service and used canines to determine that they contained marijuana. (TR 13, 36).

---

[2] A transcript of this proceeding was prepared. (Doc. 164).  When citing to the testimony taken at the hearing, the Court will refer to the transcript as "TR."

[3] Trial is scheduled for November 18, 2013, and the plea deadline is November 1, 2013. (Doc. 153).

1       According to Agent Pedrego, a source advised agents that Defendants would
2 be involved in a drug transaction on November 19, 2012, and as a result, other law
3 enforcement agencies were advised and asked to participate. (TR 14). A pre-
4 operational meeting was held at approximately 8:30 a.m. where officers were told
5 who the targets were and were provided pictures of them. (TR 14, 15, 28). They
6 were informed that a marijuana transaction was going to take place that day and that
7 the people involved would be travelling in a silver Chrysler with California plates.
8 (TR 17). They would be leaving a house on Black Mesa Trail and would be going to
9 a house on 33rd Street where they would pick up the marijuana. (TR 11, 18, 19).
10 With respect to Jagan Bruce, officers were advised that he was an ICE fugitive, was
11 pending a removal hearing and when stopped and would likely provide an Arizona
12 driver's license under an alias. (TR 15, 16).

13       After the meeting, Agent Pedrego conducted surveillance a few homes away
14 from the Black Mesa Trail house. (TR. 18). When he saw Defendants leave the
15 house, he called out over the radio to other agents that Defendants were on the move.
16 (TR. 18, 19). The agent left the Black Mesa Trail house and went to the general
17 neighborhood of the house on 33rd Street. (TR 20, 21). While there, a maroon
18 Chevrolet Malibu arrived and a Hispanic man came out of the house and spoke to the
19 driver of the Malibu. (TR 21). The man went back in the house then came back out
20 and got into the passenger's side of the Malibu. (TR 21). He remained there for
21 about a minute and then went back inside the house. (*Id.*). The Malibu departed and
22 came back approximately 15 minutes later. (TR 22). The same Hispanic male exited

1 the house again, went up to the driver's side window of the Malibu, retrieved a
2 brown cardboard box from the driver and then went back inside the house with the
3 box. (TR 22, 23).

4 Agent Pedrego did not see what happened after the Hispanic male went back
5 into the house but was notified by other officers that Defendants put the box of
6 marijuana in their car and drove away. (TR 23, 24). Arizona Department of Public
7 Safety Officers were given the direction Defendants were travelling and a traffic stop
8 was coordinated. (TR 23, 24). Agent Pedrego described this procedure as a "wall
9 stop" where plain clothes agents ask uniformed law enforcement officers to conduct
10 traffic stops for them. (TR 24). So as to not tip off those being investigated, the
11 officers who conduct the stop will act as if they don't know about the investigation.
12 (Id.).

13 **B.     Special Agent Suden**

14 DHSI Special Agent Suden testified that he was at the pre-operational meeting
15 that morning as were about 10 to 15 other agents. (TR 51, 52). There, he learned
16 that officers would be following Tamelia Bruce from a location in Oro Valley to the
17 south side of Tucson where it was believed she would purchase marijuana. (TR 39).
18 Tamelia Bruce's brother, Jagan Bruce, was believed to be part of the conspiracy and
19 was expected to be with Tamelia Bruce during the purchase. (TR 39, 40). Officers
20 were provided a picture of Jagan Bruce and were told that he might attempt to run as
21 it was believed he was using a fictitious identity. (TR 39, 40).

22

1  After the meeting, Agent Suden followed the Chrysler from Oro Valley to a
2  house on 33rd Street. (TR 41; Exs 1, 2). He was able to identify the two people in
3  the car as Tamelia and Jagen Bruce. (TR 41). The agent parked diagonally across
4  from the 33rd Street house, maybe 40 yards away. (*Id*.). From his vantage point,
5  using both his naked eye and binoculars, he could see the front of the 33rd Street
6  house. (TR 42). By the time Agent Suden got to the house, the Chrysler was already
7  parked on the side of the house but other agents told him that the Chrysler pulled into
8  the driveway at 11:07 a.m. (TR 43, 44). An hour later, the agent saw the Malibu
9  arrive, pull into the driveway and a Hispanic male exited the 33rd Street home,
10 approached the driver of the Malibu and then went back inside. (TR 45, 46). He
11 then came back out, got into the passenger's side of the Malibu where he remained
12 for approximately five minutes then returned to the house. (TR 46). Agent Suden
13 believed that the driver of the Malibu left to acquire narcotics. (TR 46). Fifteen
14 minutes later, at 12:23 p.m., the Malibu returned, again pulling into the driveway and
15 the Hispanic man came out of the house and approached the driver of the Malibu.
16 (TR 46, 47). The driver gave him a light tan typical cardboard box, about 12 inches
17 by 12 inches by 24 inches and the man returned to the house. (TR 47, 48, 49; Ex. 3,
18 4, 5). The meeting lasted about five minutes and then the Malibu departed. (TR 46).
19  According to Agent Suden, while officers did not have any information in real
20 time, someone that was inside the 33rd Street house was providing details
21 intermittently to agents as to what was occurring inside. (TR 43, 53, 59). Twenty
22 minutes after the Malibu departed the house, Defendants left the house in the

Chrysler. (TR 48, 49, 54). By then, aerial surveillance had arrived and both cars were kept under constant surveillance. (TR 60). Agent Suden testified that information was put out over handheld radios to all officers involved in the surveillance about what was going on so that by the time Defendants left the house, agents strongly believed they had narcotics in their car. (TR 57). Agents were advised not only when the marijuana was delivered to the house, but also when it left the house in the Defendants' car. (TR 59).

### C. Special Agent Downey

DHSI Agent Downey testified that he was not at the pre-operational meeting but was part of the surveillance team. (TR 63). After Agent Suden left the 33rd Street house to follow the Malibu, Agent Downey stayed at the house to keep an eye on the Chrysler. (TR 65). The agent admitted that during the twenty minutes he was at the house, he did not see either Tamelia or Jagan Bruce carry a box and get into the Chrysler however, he was only able to see when the car exited the driveway. (TR 67, 68).

### D. Officer Duckett

Officer Duckett testified that he has been an officer with the Department of Public Safety for 21 years and during that time has seized drugs in a number of cases. (TR 71). On the morning of November 19, 2012, at approximately 8:00 a.m., Officer Duckett was invited to participate in a pre-operational meeting by federal agents. (TR 89). At 9:00 a.m., he met with agents and officers and was advised that he would be needed to conduct a vehicle stop. (TR 71, 74, 89). He was given the

California license plate number of the car he would be stopping and was told that it would contain marijuana. (TR 73; Ex. 2). He was told that other agents would provide the surveillance and when the car was loaded with marijuana, they would let him know it was time to make the stop. (TR 89). Although Officer Duckett was not told exactly who would be in the car, he was given a picture of Jagan Bruce and was told that if he was in the car at the time of the stop, he would likely provide a false identification. (TR 72, 89). Officer Duckett was also told that there was an immigration warrant for Jagan Bruce's arrest. (TR 73).

After the meeting, Officer Duckett stayed in the Tucson area so he would be in the vicinity when needed. (TR 74). Agents intermittently updated him so he could place himself strategically in the right place to conduct the stop. (TR 90). At about 1:00 p.m., Officer Duckett got the call, was told that officers had been watching the car and now knew it contained marijuana. (TR 75). He was given the general direction the Chrysler was travelling and was told to stop it. (TR 76, 93).

Within five to ten minutes, Officer Duckett found the car and determined that the driver and passenger matched the description he was given earlier. (TR 75, 76). He travelled only a quarter mile to catch up to the Chrysler. (TR 97). As it merged onto the interstate, he got about a quarter mile behind it, followed it for a short distance and when he saw that the driver changed lanes without signaling, conducted a vehicle stop. (TR 77, 99). Officer Duckett had been told earlier by agents that he was to develop his own probable cause for the stop so he waited until he saw a violation to conduct a vehicle stop. (TR 97, 99). According to the officer, he would

have stopped the car for the lane violation regardless of the information transmitted by agents that the car contained marijuana. (TR 77). His back-up officer, Officer Kretchmer, arrived at about the same time as Officer Duckett conducted the stop. (TR 93, 99).

Both officers approached the car; Officer Kretchmer told Officer Duckett that he could smell marijuana. (TR 79, 99, 105).[4] Officer Duckett told the driver, Tamelia Bruce, to step out of the car and to step back to his police car where he questioned her about the rental car. (TR 79, 80, 100. 101). He asked her if there was contraband in the car and she said no. (TR 80). He asked if he could search the car and she said no. (*Id*.). He then issued Tamelia Bruce a warning for failing to use a signal while changing lanes. (TR 102, 103).

Since the purpose of the stop was not yet complete, Officer Duckett told the passenger, Jagan Bruce, to step out of the car. (TR 82, 106, 108). As expected, Jagan Bruce gave Officer Duckett a false identification. (TR 72). For officer safety reasons, the officer handcuffed both Defendants. (Id.). According to Officer Duckett, even though Defendants were handcuffed, they were not officially under arrest. (TR 82). A canine sniff was conducted and after the dog positively alerted,

---

[4] Officer Duckett never included this important fact in his report and Officer Kretchmer did not testify at the hearing. (TR 99,100). As such, the Court will not consider what Officer Kretchmer may have smelled and communicated to Officer Duckett as a justification for the arrest of Defendant Jagan Bruce.

1 officers found a box of marijuana. (TR 80, 81; Exs 3, 4, 5). It was then that Officer

2 Duckett says he officially placed Defendants under arrest. (TR 82).

3 **II.     Conclusions of Law**

4     **A.     Stop of the Car[5]**

5    The Fourth Amendment protects the right of the people to be secure in their

6 person, houses, papers, and effects against unreasonable searches and seizures.

7 *United States v. Hensley*, 469 U.S. 221, 226 (1985). Consistent with the Fourth

8 Amendment, police may stop persons in the absence of probable cause under limited

9 circumstances. *Terry v. Ohio*, 392 U.S. 1, 88 (1968). Law enforcement agents may

10 briefly stop a moving automobile to investigate a reasonable suspicion that its

11 occupants are involved in criminal activity. *Hensley*, 469 U.S. at 226.

12    Reasonable suspicion exists when an officer is aware of specific articulable

13 facts that, together with rational inferences drawn from them, reasonably warrant a

14 suspicion that the person to be detained has committed or is about to commit a crime.

15 *United States v. Cortez*, 449 U.S. 411, 416-18 (1981). When assessing the

16 reasonableness of a police officer's actions, the court must consider the totality of the

17 circumstances which confronted the officer at the time of the stop. *United States v.*

18 *Sokolow*, 490 U.S. 1, 8 (1989).

19    Here, the defense argues not so much that the agents involved in the federal

20 on-going investigation did not have reason to stop the Chrysler, but that Officer

21 ───────────────

22 [5] Defendant conceded in his Reply that the car was lawfully stopped (Doc.145) but then argued against the stop at the hearing. (TR 119).

Duckett himself was not legally justified in conducting the stop. "[H]e was completely kept out of the dark out of all the specifics of what was going on…There was no probable cause." (TR 118). The Court disagrees. In assessing the totality of the circumstances, a court may look to the "collective knowledge" of all officers involved in a criminal investigation. *United States v. Bertrand*, 926 F.2d 838, 845 (9th Cir.1991).

Traditionally, the Ninth Circuit has applied the collective knowledge doctrine in two situations: first, when agents are not participating together in an investigation, the officer with direct personal knowledge of all the facts directs or requests that a nonparticipating officer conduct the stop, *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990); and second, when officers are participating together in an investigation, the missing pieces are imputed to the officer conducting the stop even if each officer has not explicitly communicated the facts he has learned independently to the officer conducting the stop, *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001).

More recently, the Ninth Circuit addressed the distinction between officers in a "coordinated-investigation" (those officers functioning as a team) and officers "minimally communicating" (those officers acting as independent actors who merely happen to be investigating the same subject). *United States v. Ramirez*, 473 F.3d 1026 (9th cir. 2007). Blurring the court's earlier distinction, the *Ramirez* court noted, "[w]here one officer directs another to take some action, there is necessarily a 'communication' between those officers, and they are necessarily functioning as a

team." *Id.*, at 1036. After conducting a lengthy analysis of Supreme Court cases as well as other circuit court cases, the Ninth Circuit held,

> We are satisfied that the collective knowledge doctrine includes no requirement regarding the *content* of the communication that one officer must make to another. Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.

*Ramirez*, 473 F3d at 1036. *See also United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) (collective knowledge doctrine allows court to impute police officers' collective knowledge to officer conducting stop, search, or arrest); and *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) (so long as officer who orders arrest or search has knowledge of facts establishing probable cause, it is not necessary that officers actually making arrest or conducting the search be personally aware of those facts).

In the present case, while Officer Duckett was not provided *all* of the details of the year-long federal investigation, he was provided with enough information to effectuate a legal stop. On November 19, 2012, at approximately 9:00 am, agents met with Officer Duckett, and 10 to 15 other agents and officers, and provided them with a general account of the marijuana transaction they believed would take place that day. Officer Duckett was told that his main duty would be to stop one of the cars believed to be involved in the deal. He was given the make, model and color of the car as well as the car's California license plate number. He was given a description

11

1  of the people that were expected to be in the car and was even provided pictures of

2  Tamelia and Jagan Bruce.  Officer Duckett was asked to be in the general vicinity of

3  the alleged marijuana exchange so that when agents told him the car had been loaded

4  with marijuana, he could quickly effectuate the stop.

5  After the meeting, agents and officers went about their assigned duties.  The

6  agents that were conducting surveillance learned that Defendants arrived in the

7  Chrysler to the house on 33rd Street at 11:07 a.m.; the Malibu arrived an hour later

8  and the driver met with a Hispanic man who had been in the house; the Malibu left,

9  presumably to get the marijuana, and came back 15 minutes later (at about 12:23

10 p.m.); the same Hispanic man came out of the house and the driver of the Malibu

11 gave him a box believed to contain the marijuana; 20 minutes after the Malibu

12 departed, the Chrysler left the house.  Agents kept both cars under continuous aerial

13 surveillance.

14 Agents communicated with Officer Duckett intermittently via hand held radio

15 and at approximately 1:00 p.m., Officer Duckett was told the marijuana transfer had

16 occurred.  He was given the direction the Chrysler was travelling.  The officer

17 located the Chrysler, confirmed that its occupants were those described earlier, and

18 stopped the car.  The stop was legal based both on the facts provided by other agents

19 as well as the inferences drawn by Officer Duckett.

20 According to the defense, no one testified that they saw the box of marijuana

21 go from inside the 33rd Street house to the Chrysler.  That argument ignores Agent

22 Suden's testimony that someone who was inside the house, presumably the

12

1 confidential source, was telling agents, not in real time, but intermittently, what was
2 occurring in the home.  By the time Defendants left the house in the Chrysler, Officer
3 Duckett had a reasonable basis to believe that the marijuana had been placed in
4 Chrysler and would still be there when he stopped and searched the car.

5       That Officer Duckett was told to develop his own reason to stop the car is
6 irrelevant.  Based on the collective knowledge of the agents involved in the on-going
7 investigation he had reasonable suspicion to conduct a legal stop.  The stop
8 comported with the Fourth Amendment.[6]

9     **B.**     **Continued Detention**

10       A seizure that is lawful at its inception can violate the Fourth Amendment if
11 its manner of execution unreasonably infringes interests protected by the
12 Constitution. *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). A seizure that is
13 justified solely by the interest in issuing a warning ticket to the driver can become
14 unlawful if it is prolonged beyond the time reasonably required to complete that
15 mission. *Illinois v. Caballes*, 543 U.S. 405, 407-408 (2005).  Unless the officer has
16 an objectively reasonable suspicion that illegal activity unrelated to the stop has
17 occurred, the resulting detention is reasonable only so long as the officer's
18 subsequent conduct is reasonably related in scope to the circumstances which

---

[6] Because the Court finds there was reasonable suspicion to stop the car, the Court did not reach the issue of whether Defendant, a passenger in a rented vehicle, has standing to challenge the stop that led to the discovery of the marijuana. Irrespective of whether Defendant has standing to contest the stop, he clearly has standing to contest his continued detention during the canine search. *Brendlin v. California*, 551 U.S. 249, 254 (2007).

13

1  justified the initial stop. *United States v. Edgerton*, 438 V.3d 1043, 1047 (9th Cir.
2  2006).

3        According to the defense, even if the initial traffic stop of Tamelia Bruce was
4  lawful, the purpose of the stop was effectuated when Officer Duckett handed her the
5  warning for failing to use a signal while changing lanes.  Thus, any additional
6  detention for the purposes of using the drug dog to confirm the presence of marijuana
7  was unlawful.  The Court disagrees.

8        Officer Duckett did not stop the car *solely* to issue a warning ticket to the
9  driver.  In fact, while it is well settled that evidence of a traffic violation is sufficient
10 reasonable suspicion to stop a vehicle, *Whren v. United States*, 517 U.S. 806, 819
11 (1996), Officer Duckett's statement that he would have stopped the car for the lane
12 violation regardless of the information transmitted by agents that the car contained
13 marijuana is just not credible.  The real reason Officer Duckett stopped the car was
14 because fellow agents told him to do so and, as the Court previously stated, the
15 agents who communicated with Officer Duckett had more than ample reason to
16 believe the Chrysler contained marijuana.  Officer Duckett's mission was to stop the
17 car and find the box of marijuana agents told him would be in the car.  He conducted
18 the vehicle stop, detained the occupants and had his dog walk around the car.  When

19
20
21
22

14

it alerted to the presence of drugs, Officer Duckett opened the trunk, discovered the box of marijuana and formally arrested the driver and the passenger.[7]

Officer Duckett had a reasonable, articulable suspicion that Defendants were involved in criminal activity unrelated to the traffic violation. Reasonable suspicion for further detention existed after the point the officer issued the driver a warning for failing to use a turn indicator when changing traffic lanes. Defendant's resulting detention was therefore legal.

**III.   Recommendation for Disposition by the District Judge**

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule Civil 72.1, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, DENY Defendant's Motion to Suppress (Doc. 133).

This Report and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment in the case.

The parties have fourteen (14) days from the date of service of a copy of this report and recommendation to file specific written objections with the District Court.

---

[7] Presumably because the Defendant was an ICE fugitive with a warrant pending for his arrest and presented a false identification to Officer Duckett, Defendant does not argue that he was in custody when handcuffed and since the marijuana had not yet been discovered, there was no probable cause to arrest him.

15

See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.

Thereafter, the parties have ten (10) days within which to file a response to the objections. No replies are permitted without leave of court.

If any objections are filed, this action should be designated case number: CR 12-02519-TUC-DCB. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 25th day of September, 2013.

*Jacqueline M. Rateau*
Jacqueline M. Rateau
United States Magistrate Judge