**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

United States of America,
Plaintiff,
v.
Jagan Bruce,
Defendant.

CR-12-2519-TUC-DCB

**ORDER**

This matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1)(B) and the local rules of practice of this Court for hearing and a Report and Recommendation (R&R) on the Defendant's Motion to Suppress. Before the Court is the Magistrate Judge's Report and Recommendation (Doc. 170) on the Defendant's Motion to Suppress. The Magistrate Judge recommends to the Court that the Motion to Suppress may be denied. The Defendant filed an Objection (Doc. 171)to this Recommendation and the Government filed a Response (Doc.174). The Court now rules without the need for oral argument based on the thorough record before it.

**STANDARD OF REVIEW**

When objection is made to the findings and recommendation of a magistrate judge, the district court must conduct a de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).

**DISCUSSION**

The R&R addresses the vehicle stop and continued detention in the context of collective knowledge. The Objection addresses both the evidence collected after a traffic stop and "prolonged" detention after the stop for lack of reasonable suspicion that criminal activity of the Defendant as a passenger in the vehicle, particularly questioning the collective knowledge of the law enforcement officers involved. The Government objects to the mischaracterization of the evidence as a whole in the Defendant's Objection.

The Fourth Amendment right to be secure from unreasonable searches and seizures by the government "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce,* 422 U.S. 873, 878(1975). A brief investigatory stop does not violate the Fourth Amendment, however, "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 7 (1989).

In determining whether a stop was justified by a reasonable suspicion, a court should consider whether, in light of the totality of the circumstances, the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18(1981). For purposes of this analysis, the totality of the circumstances includes "objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of law-breakers." *Id.* at 418. In order to uphold the validity of the investigatory stop, a court must discern from these factors "a

particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez,* 449 U.S. at 417-18. Often, the data in the record seems equally capable of supporting an innocent explanation as a reasonable suspicion. In such cases, the Supreme Court directs a court to give due weight to the factual inferences drawn by law enforcement officers, *United States v. Arvizu,* 534 U.S. 266, 277 (2002), and has noted that officers may make reasonable deductions and inferences based on their experience and specialized training that "might well elude an untrained person." *Id.* at 273. In this vein, even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion. *Id.* at 274. The Supreme Court prohibits courts from adopting a "divide-and-conquer analysis" by looking at each factor in isolation and according it no weight if it is susceptible to an innocent explanation. *Arvizu,* 534 U.S. at 274. A reasonable suspicion of criminal activity may be sufficiently particularized where officers have narrowed the time and place of expected criminal activity through deduction or through a reliable tip. *See, e.g.*, *United States v. Paopao,* 469 F.3d 760, 766-67 (9th Cir. 2006) (holding there was reasonable suspicion for a protective sweep based on a reasonably detailed tip from a reliable informant); *see also Cortez,* 449 U.S. at 419-20.

Four law enforcement officers testified at the suppression hearing: Pedrego (DHS), Suden (DHS),Downey (DHS) and Duckett (DOPS). The totality of the circumstances factors going to the formulation of reasonable suspicion are clearly addressed in the testimony from the suppression hearing.

Officer Pedrego, as one of the law enforcement officers responsible for the extended investigation into Defendant's alleged criminal activities, testified as follows:

Q Okay. When did you get involved in this investigation into the Bruces, Jagan, Tamelia, Jason, et cetera?

A I got involved in October of 2012 with this case.

Q All right. And when did the investigation first get initiated?

A It was November of 2011.

Q Okay. And when you say you got involved in October of 2012, up to what point you were up to speed as to what had been happening up until that point?

A Yes, sir.

Q Okay. And what was the nature of this investigation? What was going on?

A What was going on is back in November of 2011 agents received information that Jagan Bruce along with others were coordinating the shipment of marijuana through the mail to various cities throughout the east coast.

Q Okay. Now the conspiracy dates back to about 2010.

A 2010, yes.

Q 2010?

A Yes.

Q All right. And your information was that that's when they were starting to ship marijuana back to the east coast of the United States.

A Yes. When they opened the investigation in November of

2011 and they started looking into it, they saw that this had been happening since 2010.

Q Okay. And how did you --

A June.

Q -- learn that? You said they were shipping. What were they doing?

A They would actually package and wrap marijuana and some various shipping locations, FedEx, UPS and just shipping it in parcels through the -- through the mail.

Q Okay. As part of your involvement, were you involved in surveillances of any first?

A Yes.

* * *

Q All right. Also were there other investigative techniques that you used to be able to track that?

A Yes, there was.

Q And what was that?

A Using GPS trackers on vehicles that they were driving and that would lead us to -- they would go onto certain shipping locations where we knew that they had shipped there in the past.

Q And you had court authorization to track those vehicles?

A Yes, we did.

(Tr. 9-11.)

Q All right. Now let's move forward to November 19th, 2012. Have you once again put Tamelia and Jagan Bruce under surveillance?

A Yes, we have.
Q Early in the morning?
A Yes.
Q Did you have information that they were going to be involved in a drug transaction later that day?
A Yes, we did.
Q Okay. And that was from a source?
A Yes.
Q All right. As a result of that information, did you garner systems from other law enforcement agencies?
A Yes, we did.
Q And who -- what agencies were those?
A Arizona Department of Public Safety and the Pima County Sheriff's Office.
Q Okay. Was there a pre-operational or a pre-op meeting with these other officers and agents?
A Yes, there was.
Q And were they advised of information for example if there was an ongoing investigation?
* * *
Q All right. But anyway, you provided information that there would be an alias he used.
A Yes, we did.
Q By who?
A By Jagan.
Q Okay. And what was that alias?
A Jagan would use the alias Kia Smith.

Q And what type of ID did he use?

A Arizona driver's license.

Q Okay. And that was provided to other officers and agents earlier in the morning?

A Yes, it was.

Q Was Officer Duckett from DPS one of those officers who was at that meeting and advised of that information?

A Yes, he was.

Q All right. And was he -- what else was he advised of that morning regarding this investigation and those particular targets?

A He was advised that Jagan Bruce was in fact an ICE fugitive and was pending removed. He had never shown up to his removal hearing, so he was a fugitive under ICE.

Q Okay. Was he also advised that there was a pending marijuana transaction going to take place and that he would be provided --

(Tr. 14-16.)

Q Was he provided information regarding the people that may be in?

A Yes, he was.

Q And what information was that?

A He was brought information that the vehicle was going to be a silver Chrysler 200 with California plates, that that's the vehicle we had seen him in prior -- in prior surveillance that Jagan and Tamelia had been in.

Q Okay. Did you also provide the tag number?

A Yes, we did.
Q Okay. Did you provide any information regarding narcotics?
A We -- we didn't know the exact amount of the narcotics that was going to be, but we know there would be narcotics involved.
Q Did you know what type?
A Marijuana.
Q Okay. What else did you advise him what might take place later that day?
A We advised him that the Bruces were supposed to go to a certain location, pick up the marijuana and leave and that they would contain marijuana in their vehicle after they left their vehi -- the house.
Q Did you indicate to him whether or not he could be advised when the vehicle was mobile?
A Yes.
Q And whether or not it contained narcotics?
A Yes
(Tr. 17-18).

Officer Pedrego testifies particularly about the events that occurred on November 19:

A I was stationed on Black Mesa Trail.
Q Okay. And why there?
A Because I was set up a few houses away from the -- their residence just keeping an eye on the house seeing what came in and out.
Q Okay. And what -- what happened at some point in the

morning there?

A At one point in the morning I witnessed Tamelia Bruce and Jagan Bruce leave the house, get into the silver Chrysler 200and depart the area.

Q Okay. What did you do at that point?

A At that point, I called out over the radio to other agents that were in the surveillance and told them the vehicle's on the move occupied by Tamelia Bruce and Jagan Bruce.

Q Okay. Now do you have an indication from prior information where they might be ending up?

A Yes, I did.

Q And where was that?

A I had information that they would be ending up at 244 West 33rd Street in Tucson, Arizona.

Q And based on that information, were surveillance units placed in that area?

A Yes, they were.

Q Did they have a visual or -- of that location?

A Yes, they did.

Q And what's -- what's located at 244 West 33rd Street? Is that a residence?

A It's a residence.

Q Do you call the agents who were on surveillance there?

A Yes, I do.

Q Who was that?

A It was specifically Daniel Suden, Special Agent Daniel Suden –

(Tr. 18-19.)

Q All right. And what's your probable cause at that point? What do you believe has happened at this point?

A At that point we believe that Jagan and Tamelia Bruce had purchased marijuana. They had marijuana inside their vehicle and they were transporting it.

Q Okay. And as a result, what did you or some of the other agents do?

A We coordinated a traffic stop with Arizona Department of Public Safety. We let them know that the vehicle was on the move and would be traveling. We gave them out direction of travel where they were going and DPS set up.

Q And you have been provided information in fact they have taken that box of marijuana out of the house?

A Yes.

Q And that was source information?

A Yes, it was.

Q All right. Now you asked for DPS to do the -- the traffic stop. Why is that?

A It's just a wall stop. It's what we do as a lot of times plain clothes agents ask for a uniformed law enforcement assistance to do traffic stops for us.

Q And often times these law enforcement officers will act like they don't know about the investigation, they don't want to tip off the Defendants as to an ongoing investigation --

A Yes.

Q -- is that right?

A Yes, sir.

(Tr. 23-24.)

Q Now you indicated that you didn't have real time information as to what was going on in the house on November 19th, is that right?

A That's right.

Q But you did have information -- did you have cues -- for example, were you cued that there was in fact marijuana in the house?

A Yes.

Q All right. Were you cued that in fact marijuana had left the house?

A Yes.

Q Okay. And that's -- were you then advised by agents that the time the marijuana had left the house was that Tamelia and Jagan Bruce had left in their vehicle.

A Yes.

Q All right. Now in terms of the parcels, he -- I think Mr. Scileppi said something about trackers on the parcels. The GPS trackers are on vehicles, correct?

A Correct.

Q Now the tracking of the parcels seized through warrants, correct?

A Correct.

(Tr. 35.)

Officer Duckett actually stopped and detained Defendant on November 19. He testified:

A I was provided with -- with a possible suspect information with vehicle information and also that they were conducting the surveillance and that they would contact me later when they knew that -- that there was narcotics in the vehicle and that I would stop the vehicle.

Q Okay. Did they give you a picture of Mr. Jagan Bruce?

A Yes, they did.

Q Did they indicate to you that he may or may not be present at the time of the stop?

A That's true.

Q And did -- what else did they indicated if he was present in terms of identification?

A If he was present, they stated that he would give me a false ID.

Q And did that in fact happen?

A Yes, it did. (Tr. 72.)

Q What was the purpose of having you do the stop rather than the federal agents?

A They -- at -- at the briefing they told me that they were trying to wall off the investigation.

Q Okay. They didn't want to tip off that there was a federal investigation going on.

A That's true.

Q Now so after that pre-operational meeting of the morning of November 19th when you went about your regular duties, what did you do?

A Basically my regular duties, but I stayed in the area

-- the Tucson area so that I would be available when they needed me. (Tr. 74.)

Q And did the driver of the vehicle and then the passenger match the general description of what you've been given early in the morning?

A The passenger did. The driver information that I had gotten came to me from their surveillance.

Q Okay. Did it do a lane -- make a lane violation at that point?

A Yes, it did. It -- it made a change from the -- from the slow speed lane to the high speed lane without signaling its intent.

Q Was there a lot of traffic in the area at the time?

A Yes, it was heavy traffic at the time.

Q And so that alone is reason for you to stop the car?

A Yes, it was.

Q Now at that time while you were on this information about the vehicle itself, what it may contain, what it has been going on, correct?

A Yes.

Q ...What did you do?

A Basically I approached the vehicle on the passenger side. I spoke with both the driver and the passenger. I noticed some indicators of possible criminal activity afoot.

Q What would that be?

A They were -- I believe they were not the -- the renters of the vehicle. They were -- they appeared to be excessively

nervous and, you know, as I spoke to them. I went ahead and hadthe driver step out and walk by to my patrol car and spoke with the passenger. He seemed a bit evasive when I was talking to him.

Q Okay. Did you at some point have a chance to check out the paperwork that went with the rental vehicle?

A Yes, I did.

Q And were you able to determine that neither the driver nor the passenger were on that paperwork?

A Yes, sir.

Q So it was a third party rental?

A Yes, it was.

Q Did that provide any suspicion to you at all?

A Yes, it did.

Q And why?

A That's a common tactic that -- that the drug trafficking organizations use to move drugs around is -- is to -- somebody else will rent the vehicle and then somebody else will drive it.

Q Okay. Did you ask whether you could search the vehicle at that point?

A Yes, I did.

Q And what did she say?

A She said no.

Q Okay. So what did you do at that point?

A At that point, I went ahead and had Mr. Bruce step out of the vehicle. I advised them -- both of them at that time that

-- that the other officer could smell marijuana in the vehicle and that I was going to my utilize my drug detection K-9 to perform a sniff of the vehicle.

Q Was that standard?

A Yes, it is. (Tr. 80.)

In a traffic-stop setting, the *Terry* condition of a lawful investigatory stop is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into vehicular violation; police need not have, in addition, cause to believe any occupant of vehicle is involved in criminal activity. *Arizona v. Johnson*, 555 U.S. 323 (2009). In Fourth Amendment terms, a traffic stop entails a "seizure" of the driver even though the purpose of the stop is limited and the resulting detention quite brief. *Brendlin v. California*, 551 U.S. 249 (2007). In evaluating the reasonableness of the length of detention after an investigatory stop, a court must consider whether the police were acting in a swiftly developing situation, whether suspect's actions contributed to the added delay, and whether, in attempting to confirm or dispel his suspicions of illegal activity, officer used threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics. *Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011).

Officer Duckett testified that he had an independent valid basis to conduct a pretextual traffic stop, *see Whren v. United States,* 517 U.S. 806, 812–13 (1996), and that he asked questions unrelated to the purpose of the traffic stop that did "not prolong an initially lawful stop." *United States v. Turvin,* 517 F.3d 1097, 1100 (9th Cir. 2008). Furthermore, Officer Duckett developed reasonable suspicion to justify

his questioning during the traffic stop. *United States v. Mendez,* 476 F.3d 1077, 1080 (9th Cir. 2007).

The "collective knowledge" doctrine applies to this case. This doctrine "allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest." *See United States v. Villasenor,* 608 F.3d 467, 475 (9th Cir.2010). Where one officer knows facts constituting reasonable suspicion, "and he communicates an appropriate order or request, another officer may conduct a warrantless stop" without having been told the facts justifying the suspicion. *See United States v. Ramirez,* 473 F.3d 1026, 1036–37 (9th Cir.2007). Officer Duckett obtained information from the pre-op meeting and the doctrine applies to "aggregate the facts known to each of the officers involved," regardless of whether the information giving rise to probable cause was actually communicated to the troopers. *Id.* at 1032; *see also United States v. Sutton,* 794 F.2d 1415, 1426 (9th Cir. 1986).

Applying the collective knowledge doctrine, Officers Duckett, Pedrego, Suden and Downey had knowledge that a specific vehicle, the rented silver Chrysler 200, would contain controlled substances at a given time and they would notify Officer Duckett of where and when. They also provided a description of the driver and the passenger. The officer located the vehicle after the suspected drug transaction had taken place, and after speaking to the other agents, the officer followed the vehicle and had reasonable suspicion to pull the vehicle over when the driver, Tamelia Bruce, made a lane change violation. These facts, taken together, easily establish reasonable suspicion to prolong detention for further investigation. The collective knowledge of the law enforcement officers who were involved in the long-term investigation in the

Defendants' alleged drug trafficking activities provided reasonable suspicion to believe that Defendant had narcotics in the car. *United States v. Hensley,* 469 U.S. 221, 232 (1985); *United States v. Burkett,* 612 F.3d 1103, 1107 (9th Cir. 2010).

The Supreme Court has made clear that an officer's subjective thoughts play no role in the Fourth Amendment analysis. *Whren v. United States,* 517 U.S. 806, 811–13 (1996). More specifically, the fact that officers acted on one rationale "would not foreclose the [government] from justifying [the search] by proving probable cause." *Florida v. Royer*, 460 U.S. 491, 507 (1983); *United States v. Willis,* 431 F.3d 709, 715 (9th Cir.2005) ("*Whren* stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose.") Prior decisions have applied the collective knowledge doctrine in at least two situations. The first situation is where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned. The facts of this case illustrate a second situation in which the collective knowledge doctrine applies: where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest. The application of the collective knowledge doctrine to such situations has its roots in numerous decisions of the Supreme Court and lower courts. The collective knowledge doctrine includes no requirement regarding the *content* of the communication that one officer must make to another. Where one officer knows facts

constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment. *Ramirez*, 473 F.3d at 1036.

In this case, based on the totality of the circumstances, which includes the collective knowledge of the agents in the on-going long term investigation, this Court concludes, after conducting a de novo review of the record, that the stop did not violate the Fourth Amendment. The collective knowledge doctrine generally applies where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned, and where an officer with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion directs or requests that another officer conduct a stop, search, or arrest. *United States v. Villasenor*, 608 F.3d 467 (9th Cir. 2010). The assessment of reasonable suspicion is to be made in light of the totality of the circumstances; even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion. *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013). Possible criminality is key to any *Terry* investigatory stop or prolonged detention. *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012); *United States v. Miguel,* 368 F.3d 1150, 1153 (9th Cir. 2004) ("Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.")

Further, the detention was based on a reasonable, articulable suspicion that Defendant was involved in ongoing criminal activity unrelated to the traffic violation. *United States v. Miguel,* 368 F.3d 1150, 1153 (9th Cir. 2004) ("Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.") Possible criminality is key to any *Terry* investigatory stop or prolonged detention. *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

Based on the foregoing, the Court will adopt the Report and Recommendation in its entirety.

Accordingly, after conducting a de novo review of the record,

**IT IS ORDERED** that the Court **ADOPTS** the Report and Recommendation (Doc. 170) in its entirety. The Objections (Doc. 171) raised by the Defendant are **OVERRULED.**

**IT IS FURTHER ORDERED** that Defendant's Motion To Suppress (Doc. 133) is **DENIED.**

DATED this 4th day of December, 2013.

David C. Bury
United States District Judge